1

2

3                    **UNITED STATES DISTRICT COURT**

4                  **NORTHERN DISTRICT OF CALIFORNIA**

5                          **SAN JOSE DIVISION**

6

7    BITTORRENT, INC.,                    Case No.  12-cv-02525-BLF

           Plaintiff,

8

9        v.                              **ORDER GRANTING MOTION FOR DEFAULT JUDGMENT**

10   BITTORRENT MARKETING GMBH,           [Re:  ECF 39]

           Defendant.

11

12

13        Before the Court is the Motion for Default Judgment by plaintiff BitTorrent, Inc., whereby

14   Plaintiff seeks default judgment, an award of statutory damages, costs and reasonable attorney

15   fees, as well as injunctive relief against defendant BitTorrent Marketing GMBH for (1) trademark

16   infringement in violation of 15 U.S.C. § 1114; (2) unfair competition and false designation of

17   origin in violation of 15 U.S.C. § 1125(a); (3) state law unfair competition in violation of

18   California Business & Professions Code § 17200, *et seq.*; and (4) violation of the Anti-

19   Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).  Compl. ¶¶ 37-61; Pl.'s

20   Mot., ECF 39.  The Court held a hearing on the motion on August 7, 2014 and ordered additional

21   briefing on a number of issues; Plaintiff submitted the requested supplemental briefing on August

22   28, 2014.  Pl.'s Supp. Br., ECF 44.

23        Having carefully considered Plaintiff's submissions, the Court hereby GRANTS Plaintiff's

24   Motion for Default Judgment.

25   I.    **BACKGROUND**

26        A.    **Plaintiff's Business and the BITTORRENT Mark**

27        Plaintiff is a well-known provider of peer-to-peer digital delivery software.  Plaintiff is the

28   owner of the famous BITTORRENT mark, which has been in continuous use since 2001,

United States District Court
Northern District of California

including for five years after it became a federally registered trademark in 2007. *Id.* ¶¶ 11, 13-15. Plaintiff also owns the BITTORRENT DNA mark, registered on January 20, 2009, and the BITTORRENT & Wave Design mark registered on December 8, 2009. *Id.* ¶ 13. Collectively, these "BitTorrent Marks" are used to market and distribute Plaintiff's file-sharing products and services and they are federally registered for that purpose. *Id.* ¶¶ 11-13, Exh. A.

Launched in July 2001 by its founder, Bram Cohen, Plaintiff's "BitTorrent" protocol reduces server and network impact associated with distributing large files over the Internet by breaking those files down into smaller pieces and allowing a user to download many different pieces at the same time from a "swarm" of different peer hosts.[1] Compl. ¶¶ 8-11. Users of the BitTorrent protocol must download and install a compatible client onto their computers. Since 2001, Plaintiff has offered under the BITTORRENT trademark, in the United States and abroad, a client compatible with the BitTorrent protocol. *Id.* ¶¶ 10, 18. Plaintiff has also offered products and services to assist third parties in delivering digital content since 2007 under the BITTORRENT and BITTORRENT DNA trademarks. *Id.* ¶ 10. The BitTorrent protocol is one of the most commonly used protocols for transferring large files over the Internet. *Id.* ¶ 16. As a result of Plaintiff's use and promotion of the BitTorrent Marks and associated products and services, the marks enjoy a high degree of consumer recognition. *Id.* ¶ 17.

### B.   Defendant's Use of the BITTORRENT Mark

Defendant is a limited liability company organized under the laws of Germany. In 2003, Defendant's principal contacted Mr. Cohen to seek a partnership with the BitTorrent protocol, and to request permission to register the "Bittorrent.de" domain name in Germany.[2] Mr. Cohen refused. *Id.* ¶ 18. Defendant then registered the BITTORRENT trademark in Germany and the European Community and later incorporated the present Defendant entity—BitTorrent Marketing GmbH. *Id.* Plaintiff has since successfully cancelled these registrations, though the decisions are

---

[1] *See also Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1025-28 (9th Cir.) *cert. dismissed*, 134 S. Ct. 624 (2013) (detailed description of peer-to-peer networks and of the BitTorrent protocol).

[2] At the time, Defendant was known as "DAY Networks Adlassnig & Partner KEG."

United States District Court
Northern District of California

on appeal.  Pl.'s Mot. 5; Decl. of John Paul Oleksiuk ¶ 4, ECF 39-2.

Defendant also registered "hundreds" of domain names "consisting of the BITTORRENT trademark or near-identical approximations thereof."  Compl. ¶ 19.  Plaintiff identified 54 of these domain names registered to Defendant (collectively, "Infringing Domain Names"), in an exhibit attached to the Complaint.  *Id.* Exh. B.  Plaintiff identified 4 more offending domain names subsequent to the filing of the Complaint.[3]  *See* Pl.'s Mot. 1-2.  In 2010, Plaintiff initiated litigation in Germany against Defendant concerning these domain names.  Compl. ¶ 21.  In 2012, Plaintiff learned that Defendant had registered domain names in the United States that purport to provide access to digital content and software and services associated with viewing digital content.  Compl. ¶¶ 22-23.  Specifically, the Infringing Domain Names resolved to "bittorrent.net," which prominently displays the BITTORRENT mark at the top of the page and provides links to places such as "The Best Place to Download Music, Movies & Games! 250 times faster!," and "Over 3000 TV channels!  Watch anytime you want."  *Id.* ¶ 22.  Users who selected the links would be redirected to websites enabling them to sign up with digital download and delivery services such as "ultimate-downloadcenter.com" and "itvdish-pro.com."  *Id.* ¶ 23.

Plaintiff alleges that Defendant directly competes with Plaintiff's products and services by capitalizing on misdirected users.  Defendant allegedly generates revenue from its "bittorrent.net" website whenever users sign up for online websites and services available through links on that website.  *Id.* ¶¶ 24-26.  However, misdirected users of the "bittorrent.net" site do not in fact receive the services for which they sign up and pay.  *Id.* ¶ 27.  Moreover, Defendant has also allegedly used the Infringing Domain Names to intercept confidential correspondence intended for Plaintiff's executives and employees, and used such intercepted correspondence to further compete with Plaintiff.  *Id.* ¶ 28.  Plaintiff alleges that Defendant has also previously registered domain names incorporating the trademarks of other file-sharing companies such as Azureus Marketing GmBH, Kazaa, and Morpheus.  *Id.* ¶ 20.

---

[3] The Court's reference to "Infringing Domain Names" does not include these four later-identified domains because, as explained below, Federal Rule of Civil Procedure 54(c) does not permit the Court to enter default judgment as to claims not identified in the pleadings.

Based on the foregoing, Plaintiff asserts that Defendant adopted the BITTORRENT trademark "with the intention of capitalizing on the renown and success" of Plaintiff's mark and to "falsely associate its website and services with Plaintiff in order to trade on the substantial and valuable goodwill" surrounding Plaintiff's mark. *Id.* ¶¶ 29-31. Defendant's conduct is allegedly willful, and reflects "an intent to confuse consumers and profit from the goodwill and consumer recognition associated with Plaintiff and its mark." *Id.* ¶ 36.

### C.  Procedural History

Plaintiff filed the instant lawsuit on May 16, 2012 and then promptly attempted to serve Defendant with summons in a manner consistent with the provisions of the Hague Convention. Defendant appears to have evaded service for over a year by changing its registered address in Germany. *See* ECF 4, 18, 25; *see also* Pl.'s Admin. Mot. For Substituted Service, ECF 27. On October 15, 2013, Plaintiff filed an Administrative Motion for Substituted Service of Summons and Complaint, requesting permission of the Court to effect substituted service consistent with Federal Rule of Civil Procedure 4(f)(3) and the Hague Convention. Pl.'s Admin. Mot. The Court granted Plaintiff's motion on October 29, 2013 and authorized Plaintiff to effect substitute service on Defendant's counsel, Christoph Hoppe. ECF 28. The Court on December 4, 2013 also granted Plaintiff an extension of time in which to effect service. ECF 31. Plaintiff ultimately served Defendant's counsel by overnight mail and by electronic mail on January 20, 2014. *See* Proof of Service, ECF 32.

Plaintiff sought a clerk's entry of default on April 8, 2014, ECF 33, and the clerk entered default on April 15, 2014, ECF 35. On April 14, 2014, and April 18, 2014 the Court received a letter from Defendant's counsel, Mr. Hoppe, returning the documents that Plaintiff served on him by overnight mail and electronic mail and claiming that he is not authorized to accept service on Defendant's behalf. ECF 34, 36. On April 17, 2014, this case was reassigned to the undersigned. Plaintiff filed the instant motion on May 28, 2014. ECF 39. This Court conducted a Case Management Conference on May 29, 2014 and a hearing on Plaintiff's Motion for Default Judgment on August 7, 2014. Defendant did not appear at either hearing.

4

1

## II.    JURISDICTION

2          Before turning to the merits, the Court must first address its jurisdiction to enter default

3   judgment against Defendant.  Subject matter jurisdiction is indisputably available under 28 U.S.C.

4   §§ 1331, 1338, and 1367, as three of Plaintiff's claims arise under federal law.  The Court must

5   also have personal jurisdiction over a defendant, or else the entry of default judgment is void.

6   *Veeck v. Commodity Enterprises, Inc.*, 487 F.2d 423, 426 (9th Cir. 1973).  Here, the Court is

7   satisfied that Defendant has been served and that this Court has specific personal jurisdiction over

8   the Defendant.

9          ### A.    Service of Process

10          "A federal court is without personal jurisdiction over a defendant unless the defendant has

11   been served in accordance with Federal Rule of Civil Procedure 4."  *Travelers Cas. & Sur. Co. of*

12   *Am. v. Brenneke*, 551 F.3d 1132, 1135 (9th Cir. 2009).  However, "Rule 4 is a flexible rule that

13   should be liberally construed so long as a party receives sufficient notice of the complaint."

14   *United Food & Comm. Workers Union v. Alpha Beta Co.*, 736 F.2d 1371, 1382 (9th Cir. 1984).

15   What is required is "substantial compliance" with Rule 4, with "neither actual notice nor simply

16   naming the defendant in the complaint" being sufficient.  *Direct Mail Specialists, Inc. v. Eclat*

17   *Computerized Techs., Inc.*, 840 F.2d 685, 688 (9th Cir.1988) (quoting *Benny v. Pipes*, 799 F.2d

18   489, 492 (9th Cir.1986), *cert. denied*, 484 U.S. 870 (1987)).

19          The Court is satisfied that Plaintiff has "substantially complied" with Rule 4.  For well

20   over a year, Plaintiff attempted to personally serve Defendant with summons in Germany, using

21   means authorized by the Hague Convention.  *See* ECF 4, 18, 25; *see also* Pl.'s Admin. Mot.

22   Defendant evaded service by continuously changing its registered address and also appeared in

23   German courts to contest service authorized by the local authorities.  Pl.'s Admin. Mot. 2-3.  This

24   intervention demonstrates that Defendant has actual notice of the present lawsuit, a fact that is

25   affirmed by Defendant's maintenance of a website at "bittorrent.eu" that reports on the filings

26   made in this lawsuit.[4]  *See* Pl.'s Mot. 17; Oleksiuk Decl. ¶ 3, 6, 8, Exhs. 2, 4.  Consistent with the

27

28   ---

[4] The Court takes judicial notice that even as of the date of this order, Defendant's "bittorrent.eu"
website continues to report on the filings made in this lawsuit.  Fed. R. Evid. 201(b).

United States District Court
Northern District of California

Court's authorization pursuant to Rule 4(f)(3) to effect substituted service on Defendant's counsel, Plaintiff did so on January 20, 2014.  That Defendant's counsel returned the documents claiming lack of authorization to accept service does not obviate the fact that Plaintiff substantially complied with Rule 4 and this Court's order authorizing substituted service.  This, coupled with Defendant's actual knowledge of the pending lawsuit, is sufficient for the Court to conclude that Defendant has been appropriately served and afforded fair notice of this action.

### B.   Personal Jurisdiction

Personal jurisdiction can be either "general" or specific, *see Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415–16 (1984), though Plaintiff only argues for specific jurisdiction in this case, *see* Pl.'s Mot. 18.  In the absence of a specific statutory provision conferring jurisdiction, federal courts apply the personal jurisdiction laws of the state in which they sit.  California's long-arm jurisdictional statute is "coextensive with federal due process requirements." *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir.1998).  Thus, in order to exercise jurisdiction over a non-resident defendant, the defendant must have sufficient "minimum contacts" with the forum state such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

The Ninth Circuit Court of Appeals, in *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004), established a three-prong test for determining whether a non-resident defendant is subject to specific personal jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Id.* at 802 (citing *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir.1987).

### i.   Defendant Purposefully Directed Its Activities at California

When a case sounds in tort, as this one does,[5] the Court considers whether the defendant has "purposefully directed" its activities at the forum state by applying the three-part "effects" test first articulated in *Calder v. Jones*, 465 U.S. 783 (1984).  *See Panavision*, 141 F.3d at 1321. "Under *Calder*, personal jurisdiction can be based upon: '(1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered-and which the defendant knows is likely to be suffered-in the forum state.'"  *Id.* (quoting *Core-Vent Corp. v. Nobel Industries AB*, 11 F.3d 1482, 1486 (9th Cir.1993)).

Here, Plaintiff relies on the analogous factual scenario in *Panavision* to contend that this Court has specific personal jurisdiction over Defendant.  Pl.'s Mot. 19-21.  *Panavision* involved a California trademark holder suing an Illinois resident in California federal court.  The defendant was a prolific cybersquatter[6] who had registered domain names in a number of trademarks, including the defendant's "Panavision" mark.  Much as is the case here, the defendant in *Panavision* sought to sell the registered domain name to the trademark owner plaintiff. *Panavision*, 141 F.3d at 1319.  The plaintiff instead sued for trademark dilution, and the Ninth Circuit affirmed the California district court's conclusion that it had personal jurisdiction over the out-of-state defendant.  *Id.* at 1327.  Applying the *Calder* test to the Internet context, the court indicated that "simply registering someone else's trademark as a domain name and posting a web site on the Internet is not sufficient to subject a party domiciled in one state to jurisdiction in another" but that the defendant had done "something more" by engaging "in a scheme to register Panavision's trademarks as his domain names for the purpose of extorting money from

---

[5] Cases involving trademark infringement and cybersquatting, as alleged here, are "akin to a tort case."  *Panavision*, 141 F.3d at 1321.

[6] As discussed in further detail below, "cybersquatting" occurs when an individual other than the trademark owner registers a domain name similar or identical to the trademark, and "then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder." *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 680 (9th Cir.2005) (quoting *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir.2004)).  A corollary of cybersquatting is "typosquatting," which occurs when an individual registers domain names that are intentional misspellings of a trademark in order to capitalize on users' typographical errors.  *See Shields v. Zuccarini*, 254 F.3d 476, 483-84 (3d Cir. 2001) (finding typosquatting actionable under the ACPA).

United States District Court
Northern District of California

Panavision." *Id.* at 1322.  This "something more" was sufficient to exercise personal jurisdiction over the defendant consistent with due process and Plaintiff argues that it is sufficient to exercise personal jurisdiction over Defendant here.  Pl.'s Mot. 18-22.

In 2014, the Supreme Court revisited the *Calder* test, and the broader question of minimum contacts, in *Walden v. Fiore*, ⸺ U.S. ⸺, 134 S. Ct. 1115 (2014).  *Walden* involved the somewhat extreme situation of a *Bivens* action filed in the District of Nevada by residents of Nevada against a DEA agent from Georgia who seized the plaintiffs' money as they were traveling through Atlanta's Hartsfield–Jackson International Airport en route from Puerto Rico to Las Vegas, Nevada.  The plaintiffs also accused the agent of drafting a false affidavit to show probable cause for the forfeiture, which was forwarded to the United States Attorney's office in Georgia.  *Walden*, 134 S. Ct. at 1119–20.  Undisputed was the fact that all of the DEA agent's suit-related activities occurred in Georgia, but that he was aware of the plaintiffs' connection to Nevada.  *Id.* at 1124-26.

A unanimous Supreme Court reversed a divided panel of the Ninth Circuit, concluding that the DEA agent did not have sufficient contacts with Nevada for the appropriate exercise of personal jurisdiction in Nevada.  In so doing, the court stated that "the plaintiff cannot be the only link between the defendant and the forum."  *Id.* at 1122.  Rather, "[t]he proper focus of the 'minimum contacts' inquiry in intentional-tort cases is 'the relationship among the defendant, the forum, and the litigation.'  And it is the defendant, not the plaintiff or third parties, who must create contacts with the forum State."  *Id.* at 1126 (quoting *Calder*, 465 U.S. at 788).  Although curtailing expansive interpretations of the *Calder* effects test, the *Walden* court reaffirmed *Calder*, emphasizing that "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."  *Id.* at 1125.  Given the facts of the case, the *Walden* court expressly declined to address the question of virtual "contacts" with a forum state.  *Id.* at 1125 n.9.

Because of the *Walden* court's clarification of *Calder*, this Court ordered supplemental briefing from Plaintiff regarding the impact of *Walden* on *Panavision*, which also depended on *Calder*.  Plaintiff contends that the *Panavision* analysis of personal jurisdiction in cybersquatting

United States District Court
Northern District of California

cases still stands after *Walden* and that this Court has personal jurisdiction over Defendant even under *Walden* because Defendant's activities extorting money from Plaintiff and intercepting Plaintiff's confidential business communications constitute meaningful contacts with California.[7] Pl.'s Supp. Br. 1-5. After careful consideration of Plaintiff's supplemental briefing, the Court agrees that *Walden* does not significantly limit the jurisdictional analysis in *Panavision*.

The Court notes that cybersquatting, as is alleged here, has always been subject to a somewhat different personal jurisdiction analysis:

> Although jurisdiction questions in most ordinary domain name disputes are analyzed according to the three-part [*Calder*] test . . . a special jurisprudence seems to have developed for cases involving so-called "cybersquatters" or "cyberpirates." In a substantial number of cases, these so-called "cyberpirates" or "cybersquatters" will purposely register the trademark of a well-known corporation as a domain name with the intention of later selling that domain name to the corporation for an extraordinary profit. . . . [C]ybersquatting cases have developed their own statutory and court-made rules.

4A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure Civil § 1073.1 (Personal Jurisdiction and the Internet) (3d ed. 2002). As such, courts have routinely found the existence of specific personal jurisdiction where the defendant's alleged conduct amounts to a scheme targeted at a trademark owner designed to extort money from the mark owner for domain names that capitalize on typographical errors and user confusion. *See Facebook, Inc. v. Banana Ads LLC*, No. CV 11-03619-YGR KAW, 2013 WL 1873289, at *4 (N.D. Cal. Apr. 30, 2013) ("In sum, the Default Defendants made money by confusing Facebook users, including users in California, and capitalizing on this confusion—some of which was based on defendants' misuse of Facebook's marks, typesetting, and color scheme. This constitutes aiming their conduct at Facebook and this forum."); *see also Rhapsody Int'l Inc. v. Lester*, No. C13-05489 CRB, 2014 WL 709899, at *6-7 (N.D. Cal. Feb. 24, 2014); *Panavision*, 141 F.3d at 1327. Such is the case

---

[7] Plaintiff also contends that specific personal jurisdiction can be based on a transaction conducted on one of the infringing websites by Plaintiff's investigator in San Jose, California in 2012. Pl.'s Supp. Br. 4. The Court rejects this argument because there is no evidence of other sales in California, nor that Defendant targeted its services at a California customer base. As such, the Court declines to find personal jurisdiction based on a *de minimis* contact manufactured by Plaintiff.

1    here.[8]

2            Taking allegations in the Complaint as true and drawing reasonable inferences in

3    Plaintiff's favor, there is no question that Plaintiff has alleged that Defendant intentionally

4    engaged in a scheme to infringe Plaintiff's famous mark and force Plaintiff to pay ransom for the

5    Infringing Domain Names.  Even when Defendant offered digital download products and services

6    on the Infringing Domain Names, such offers were deceptive because paying customers would not

7    actually receive the purchased services.  Compl. ¶ 27.  Such conduct evinces an intent to

8    intentionally diminish the value of Plaintiff's trademark through customer confusion and

9    frustration and, in turn, force Plaintiff to eliminate such blemishes on its trademark by acquiring

10   the Infringing Domain Names from Defendant.  Through this scheme, Defendant's use of the

11   Infringing Domain Names put Plaintiff's "name and reputation at [its] mercy," thereby causing

12   injury to Plaintiff in California.  *Panavision*, 141 F.3d at 1327.

13           The evidence submitted in support of Plaintiff's Motion for Default Judgment further

14   reinforces this conclusion.  Defendant made its intent to ransom the Infringing Domain Names

15   clear when it met with Plaintiff's former CFO and General Counsel, Mitchell Edwards, in 2010

16   and sought to convince Plaintiff to buy its "business."  Pl.'s Mot. 8; Decl. of Mitchell Edwards ¶ 5,

17   ECF 39-10.  Certainly, this meeting took place in Germany in the context of a meeting to "discuss

18   the dispute between BitTorrent and Defendant."  Edwards Decl. ¶ 4.  However, the meeting was

19   the culmination of Defendant's cybersquatting scheme targeted at Plaintiff in California, a scheme

20   that Defendant began as early as 2003, when it contacted Mr. Cohen about partnering with

21   _____

22   [8] The Court notes that were this case based on the simple allegation that Defendant infringed
     Plaintiff's trademarks by registering the trademarked domain name or by using the marks on a
23   competing website, the facts would likely weigh against the exercise of personal jurisdiction.  *See
     Telemedicine Solutions LLC v. WoundRight Technologies, LLC*, No. 13 CV 3431, 2014 WL
24   1020936 (N.D. Ill. Mar. 14, 2014) (no personal jurisdiction over defendant who allegedly
     infringed plaintiff's trademark in online ads because no evidence that those ads were aimed at
25   forum state); *High Tech Pet Products, Inc. v. Shenzhen Jianfeng Elec. Pet Prod. Co.*, No. 1:13-
     CV-00242 AWI, 2014 WL 897002 (E.D. Cal. Mar. 6, 2014) (no personal jurisdiction over
26   defendant who allegedly infringed trademark on website that sold products throughout North
     America, but no evidence that online presence was substantially directed towards California); *sell,
27   Inc. v. sell, Inc.*, 130 F.3d 414 (9th Cir. 1997).  Here, the Court finds that the allegations
     demonstrate that Defendant's infringement of Plaintiff's trademark was incidental to its squatting
28   scheme to extort money for the Infringing Domain Names.  Thus, the *Panavision* cybersquatting
     line of cases applies.

United States District Court
Northern District of California

BitTorrent.  *See* Compl. ¶ 18.  Given the length of time that Defendant has operated this scheme, it would be reasonable to infer that Defendant was aware its conduct would have the effect of injuring Plaintiff in California, Plaintiff's principal place of business.  Thus, Defendant's intentional and systematic conduct of registering an ever-increasing number of domain names incorporating Plaintiff's trademark in an effort to extort money from Plaintiff connects Defendant to California in a meaningful way sufficient for the exercise of personal jurisdiction.

Exercising specific personal jurisdiction over a cybersquatter who, as here, knowingly registers confusingly similar domain names in a scheme to extort money from a trademark owner does not give rise to de facto universal jurisdiction.  *Cf. Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801-02 (7th Cir. 2014).  The cybersquatter is subject to suit in the forum where the trademark owner is located and experiences the brunt of the injury to its trademark.  In this case, that would be California, where Plaintiff is incorporated and maintains its principal place of business.  Because Plaintiff was the target of Defendant's scheme to extract money in exchange for domain names that incorporate Plaintiff's trademark, Defendant's contact with California is "not based on the 'random, fortuitous, or attenuated' contacts [it] makes by interacting with other persons affiliated with the State," but rather by its extortion scheme expressly aimed at Plaintiff in Plaintiff's principal place of business.  *Walden*, 134 S. Ct. at 1123 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

Based on the foregoing, the Court concludes that Defendant has "purposefully directed" its conduct at California.

### ii.  Plaintiff's Claims Arise Out of Defendant's Forum-Related Activities

The second requirement for specific personal jurisdiction, the relation between a defendant's forum-related activities and the claims at issue, asks whether Plaintiff would have been injured "but for" Defendant's conduct directed toward Plaintiff in California.  *Panavision*, 141 F.3d at 1322.  There is no doubt that this requirement is satisfied here because but for Defendant's serial registration of numerous domain names incorporating Plaintiff's trademark or misspellings thereof, Plaintiff's injury would not have occurred.  As such, Plaintiff's claims arise out of Defendant's California-related activities.

United States District Court
Northern District of California

United States District Court
Northern District of California

### iii.  Exercising Jurisdiction Over Defendant is Reasonable

If a plaintiff satisfies its burden as to the first two elements of the specific personal jurisdiction analysis, the burden then shifts to the defendant to "present a compelling case" that exercising jurisdiction would be unreasonable.  *See, e.g., Burger King*, 471 U.S. at 476.  Here, Plaintiff has successfully demonstrated that Defendant purposefully directed its conduct at California, and that Plaintiff's claims arise from that conduct.  Defendant is in default and has not appeared in this Court to "present a compelling case" that the exercise of personal jurisdiction would be unreasonable.

In any event, the Court is satisfied that the exercise of personal jurisdiction is reasonable here because Defendant interjected itself into California by targeting a California company through its elaborate cybersquatting and typosquatting scheme.  As such, Defendant had fair warning that it might be haled into the courts of this state.  *Banana Ads*, 2014 WL 1873289, at *5. Furthermore, there does not appear to be any conflict in sovereignty between courts of the United States and Germany, given Plaintiff's success in cancelling Defendant's trademark registrations in Europe, and California has an interest in redressing the tortious injuries caused to its residents. Furthermore, Defendant's refusal to appear in this action forecloses any argument that litigating in this forum is overly burdensome, and exercising personal jurisdiction to enter default judgment in this case would be an efficient resolution of Plaintiff's claims, particularly because some of the relief that Plaintiff seeks is not available in other forums.  Pl.'s Mot. 21-22; *see generally Core-Vent*, 11 F.3d at 1487-88.

As such, this Court has specific personal jurisdiction over Defendant.

## III.    ANALYSIS OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

Pursuant to Federal Rule of Civil Procedure 55(b), the Court may enter default judgment against a defendant who has failed to plead or otherwise defend an action.  "The district court's decision whether to enter a default judgment is a discretionary one."  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

In exercising its discretion to enter default judgment, a district court considers seven factors set forth by the Ninth Circuit in *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986)

1   ("*Eitel* factors"): (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's

2   substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action;

3   (5) the possibility of dispute concerning material facts; (6) whether default was due to excusable

4   neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring

5   decisions on the merits.  In considering these factors after a clerk's entry of default, the court takes

6   all well-pleaded factual allegations in the complaint as true, except those with regard to damages.

7   *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987).  The Court may, in its

8   discretion, consider competent evidence and other papers submitted with a motion for default

9   judgment to determine damages.  *Id.*

10      Only the merits and sufficiency of Plaintiff's claims (second and third factors) and the

11   amount of money at stake (fourth factor) warrant in-depth analysis.  The Court turns to those first.

12      **A.   Merits of Plaintiff's Claims and Sufficiency of the Complaint**

13      **i.   Trademark Infringement**

14      To prevail on a claim of trademark infringement, a plaintiff must demonstrate that it "owns

15   a valid mark, and thus a protectable interest" and that the defendant's "use of the mark 'is likely to

16   cause confusion, or to cause mistake, or to deceive.'"  *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190,

17   1196 (9th Cir. 2009) (quoting *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 408

18   F.3d 596, 602 (9th Cir. 2005); *see* 15 U.S.C. § 1114(1)(a), (b).  Here, Plaintiff has properly alleged

19   and demonstrated that it owns a valid mark and protectable interest in the BitTorrent Marks by

20   supplying evidence that the marks are federally registered by the United States Patent and

21   Trademark Office.  Compl. ¶ 13, Exh. A; 15 U.S.C. § 1115(a) (registration on principal register is

22   *prima facie* evidence of validity, ownership, and exclusive right to use registered mark).

23      Taking the allegations in the Complaint as true, Plaintiff has also sufficiently demonstrated

24   that Defendant's use of the mark is likely to cause confusion under the factors identified in *AMF*

25   *Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979) (identifying eight factors including (1)

26   strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual

27   confusion; (5) marketing channels used; (6) type of goods and degree of care likely to be exercised

28   by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of

United States District Court
Northern District of California

13

the product lines).  The *Sleekcraft* test is "a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them."  *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005).

Applying these factors flexibly, the allegations establish that Defendant used Plaintiff's exact mark—BITTORRENT—to offer digital download services and products on its website "bittorrent.net."  Compl. ¶ 27.  Plaintiff submitted, as an attachment to the Complaint, a screenshot of one of the Infringing Domain Names, "bittorrent.net," which prominently displays Plaintiff's trademark at the top of the page while purporting to offer access to downloads and free live television online.  *Id.* Exh. C.  Plaintiff submitted further evidence in support of its Motion for Default Judgment demonstrating that one of the Infringing Domain Names, "bitorrent.com," resolves to the domain "bittorrent.net."  Decl. of John W. Crittenden Exh. 1, ECF 39-8.  Plaintiff alleges that the other Infringing Domain Names similarly resolved to "bittorrent.net."  Compl. ¶¶ 26-27.  As such, Plaintiff has sufficiently demonstrated that each of the Infringing Domain Names is likely to cause confusion by redirecting users to a site that uses a mark identical to Plaintiff's trademark in order to offer digital download products and services.[9]

Furthermore, Defendant's registration of over fifty domain names that are either exact spellings or confusingly similar misspellings of Plaintiff's mark suggests that Defendant intentionally selected Plaintiff's mark; Defendant's default in this case prevents further discovery on this factor.  Moreover, the Court agrees with Plaintiff that because both Plaintiff and Defendant offer digital download services and products over the Internet, users are unlikely to exercise a considerable degree of care in selecting products.  Pl.'s Mot. 11-13.  Although there is no evidence of actual user confusion, Plaintiff's showing on the other *Sleekcraft* factors is sufficiently strong to find that Defendant's use of the BITTORRENT mark is likely to cause consumer confusion in violation of 15 U.S.C. § 1114.  The merits and sufficiency of the allegations thus favor entering default judgment on Plaintiff's claim for trademark infringement in violation of 15 U.S.C. § 1114.

---

[9] Although the Infringing Domain Names evidently now resolve to "bittorrent.eu," Oleksiuk Decl. ¶ 8, which posts updates on the status of this lawsuit, *id.* Exh. 4, Plaintiff has sufficiently alleged Defendant's liability for past infringing uses of the BitTorrent Marks.

United States District Court
Northern District of California

United States District Court
Northern District of California

### ii.  Unfair Competition and False Designation of Origin

Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), provides a cause of action for anyone injured by unfair competition.  "The 'ultimate test' for unfair competition is exactly the same as for trademark infringement: 'whether the public is likely to be deceived or confused by the similarity of the marks.'"  *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988).  Because Plaintiff has established Defendant's liability for trademark infringement, the merits and sufficiency of the allegations likewise favor entering default judgment on Plaintiff's claim for unfair competition and false designation of origin in violation of 15 U.S.C. § 1125(a).

### iii.  California Unfair Competition

The Ninth Circuit has "consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act."  *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994).  As with federal unfair competition claims under the Lanham Act, the "ultimate test" of state law unfair competition is the likelihood of public confusion.  *Id.* (citing *Century 21*, 846 F.2d at 1178).  Thus, the merits and sufficiency of Plaintiff's allegations also weigh in favor of entering default judgment on Plaintiff's claim for state law unfair competition in violation of California Business and Professions Code § 17200.

### iv.  Cybersquatting

Congress enacted the ACPA in 1999 as an amendment to the Lanham Act.  The ACPA targets cybersquatting, which occurs when an individual other than the trademark owner registers a domain name similar or identical to the trademark, and "then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder."  *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 680 (9th Cir. 2005) (quoting *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir. 2004)); *see also Sporty's Farm LLC v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 493 (2d Cir. 2000).  A violation of the ACPA occurs when a domain name registrant (1) registers, uses, or traffics in a domain name that (2) is identical or confusingly similar to a distinctive or famous trademark, with (3) bad faith intent to profit from the trademark.  *See* 15 U.S.C. § 1125(d).

15

Although it is not required for general trademark liability, "[a] finding of 'bad faith' is an essential prerequisite to finding an ACPA violation." *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir.2002). The ACPA enumerates nine nonexclusive factors for courts to consider in determining whether bad faith exists. *See* 15 U.S.C. § 1125(d)(1)(B)(i).[10] The use of the listed criteria is permissive, *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 269 (4th Cir.2001), and "the most important grounds for finding bad faith are the unique circumstances of the case," *Interstellar Starship*, 304 F.3d at 946 (quotation omitted). *See also Lahoti*, 586 F.3d at 1202.

---

[10] These criteria are:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
> (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
> (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

1   Plaintiff's allegations, taken as true, are sufficient to establish Defendant's liability under

2   the ACPA.  Each of the Infringing Domain Names identified by Plaintiff is registered to

3   Defendant and is identical or confusingly similar to Plaintiff's trademark.  *See* Compl. Exh. B.  On

4   the element of bad faith, it is plain that any intellectual property interest that Defendant has in the

5   BITTORRENT mark arose after Plaintiff's interest in the mark, as Defendant first sought to

6   partner with Plaintiff in 2003 and then registered marks in Europe when its partnership efforts

7   were rebuffed.  Compl. ¶ 18.  It is furthermore not clear that Defendant ever used the Infringing

8   Domain Names for bona fide or noncommercial fair use purposes, as the Infringing Domain

9   Names previously redirected users to the infringing "bittorrent.net" website, which purported to

10  offer digital download services but did not actually provide paying customers with the requested

11  services.  *Id.* ¶¶ 26-27.  Moreover, even if the Infringing Domain Names now redirect to a website

12  that passively reports on the progress of this lawsuit, it is not clear that Defendant has discontinued

13  use of the Infringing Domain Names to intercept Plaintiff's confidential business correspondence,

14  which is further evidence of bad faith.  *Id.* ¶ 28.  In fact, Defendant evidently used these

15  intercepted communications as part of its offer to Plaintiff in 2010 to sell its "business" to Plaintiff

16  for millions of dollars.  Pl.'s Mot. 15; Edwards Decl. ¶ 10.  The offer to sell Plaintiff its "business"

17  is, itself, the hallmark of a violation of the ACPA and a criterion expressly identified by Congress

18  as evidence of bad faith.  *See* 15 U.S.C. § 1125(d)(1)(B)(i)(VI).

19  As such, Plaintiff has demonstrated through its allegations and competent supporting

20  evidence that Defendant's use of the Infringing Domain Names is in bad faith and this,

21  accordingly, weighs in favor of entering default judgment on Plaintiff's claim for cybersquatting

22  in violation of the ACPA, 15 U.S.C. § 1125(d).

23  **B.   Sum of Money at Stake**

24  There is a substantial amount of money at stake in this action, as Plaintiff is seeking

25  maximum statutory penalties for each of the Infringing Domain Names that Defendant has

26  registered.  "When the money at stake in the litigation is substantial or unreasonable, default

27  judgment is discouraged."  *Bd. of Trs. v. Core Concrete Const., Inc.*, No. C 11–2532 LB, 2012

28  WL 380304, at *4 (N.D. Cal. Jan.17, 2012) (citing *Eitel*, 782 F.2d at 1472).  However, when "the

United States District Court
Northern District of California

17

sum of money at stake is tailored to the specific misconduct of the defendant, default judgment may be appropriate." *Id.* (citations omitted).

Plaintiff here has chosen to forego actual damages in favor of statutory damages under the ACPA pursuant to 15 U.S.C. § 1117(d). Pl.'s Notice of Mot. ¶ 8. Plaintiff seeks maximum statutory damages of $100,000 for each of the identified Infringing Domain Names. Were the Court to award the requested damages, Defendant would be liable for over $5 million. This Court has considerable discretion, however, to tailor the damages as it "considers just." 15 U.S.C. § 1117(d). Moreover, Plaintiff has consistently served (or attempted to serve) Defendant with the filings in this action and Defendant has actual notice of the lawsuit and the amount of money at stake. Compl. 12-14; Pl.'s Mot. 17; Oleksiuk Decl. ¶ 3, 6, 8, Exhs. 2, 4. This factor is therefore neutral, neither weighing in favor nor against the entry of default judgment.

## C.   The Remaining *Eitel* Factors

The remaining *Eitel* factors generally weigh in favor of entering default judgment. For example, Plaintiff will be prejudiced by the denial of default judgment because it would be denied the right to judicial resolution of its claims and would likely be without other recourse for the remedies that it seeks under federal trademark and anti-cybersquatting law. Pl.'s Mot. 10. There is unlikely to be a dispute concerning material facts in this action because Defendant has not answered. Moreover, it is clear that Defendant's default is not due to excusable neglect, as Plaintiff has served or attempted to serve each filing in this lawsuit on Defendant, and Defendant has actual knowledge of the progress of this action. *See* ECF 4, 18, 25; Pl.'s Admin. Mot.; Pl.'s Mot. 17; Oleksiuk Decl. ¶ 3, 6, 8, Exhs. 2, 4.

Based on the foregoing analysis, the Court finds that the factors in favor of granting default judgment outweigh the strong federal policy favoring decisions on the merits. The Court accordingly GRANTS Plaintiff's Motion for Default Judgment on Plaintiff's claims for (1) trademark infringement in violation of 15 U.S.C. § 1114; (2) unfair competition and false designation of origin in violation of 15 U.S.C. § 1125(a); unfair competition in violation of California Business & Professions Code § 17200 *et seq.*; and (4) cybersquatting in violation of the ACPA, 15 U.S.C. § 1125(d).

1   **IV.   REMEDIES**

2           Plaintiff has elected to pursue statutory damages available under the ACPA, seeking the

3   maximum penalty for each domain name found to violate the ACPA.  Plaintiff also seeks a

4   permanent injunction against Defendant's continued use of Plaintiff's mark and the Infringing

5   Domain Names, as well as an order that registrars of the Infringing Domain Names transfer

6   ownership over the domains to Plaintiff.  Plaintiff also seeks a declaration that this is an

7   "exceptional case" warranting an award of costs and reasonable attorney fees pursuant to 15

8   U.S.C. § 1117(a).  Pl.'s Mot. 22-25.  In assessing remedies, the Court does not take the allegations

9   in the Complaint as true and will examine the evidence offered by Plaintiff in support of each form

10  of requested relief.  *Televideo*, 826 F.2d at 917-18.

11          As an initial matter, the Court observes that Federal Rule of Civil Procedure 54(c) provides

12  that "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in

13  the pleadings."  Here, Plaintiff identified 54 offending domain names in the Complaint but

14  subsequently identified four more in its Motion for Default Judgment.  *Compare* Compl. ¶¶ 12-14,

15  Exh. B *with* Pl.'s Notice of Mot., ECF 39; *see also* Pl.'s Mot. 1-2.  Plaintiff seeks statutory

16  damages in connection with all 58 domains.  Pursuant to Rule 54(c), the Court cannot enter default

17  judgment as to the four newly identified domain names unless they are included in an amended

18  complaint served on Defendant, and they are not.  Accordingly, the Court will only award

19  damages and injunctive relief as to the 54 domain names originally identified in the Complaint.

20          **A.   Statutory Damages**

21          Plaintiff seeks statutory damages pursuant to 15 U.S.C. § 1117(d), which provides that

22  "[i]n a case involving a violation of section 1125(d)(1)," the plaintiff may elect statutory damages

23  instead of actual damages and profits and seek "an award of statutory damages in the amount of

24  not less than $1,000 and not more than $100,000 per domain name, as the court considers just."

25  15 U.S.C. § 1117(d).

26          Plaintiff seeks the maximum statutory penalty of $100,000 for each of the 54 Infringing

27  Domain Names.  Pl.'s Mot. 24.  The Court requested supplemental briefing at the August 7, 2014

28  hearing regarding the factors it should consider in assessing statutory damages under the ACPA.

United States District Court
Northern District of California

19

United States District Court
Northern District of California

1    Plaintiff identified the factors considered by Magistrate Judge Westmore in *Facebook, Inc. v.*

2    *Banana Ads LLC*, No. CV 11-03619-YGR (KAW), 2013 WL 1873289 (N.D. Cal. Apr. 30, 2013),

3    to be appropriate for assessing damages in this case and urged that the Court should award

4    between $90,000 to $100,000 for each of the Infringing Domain Names.  Pl.'s Supp. Br. 7-9.

5         In a default setting, this Court is hesitant to apply the maximum statutory penalty to all of

6    the infringing domain names.  *See Verizon California Inc. v. OnlineNIC Inc.*, No. C 08-2832 JF

7    (RS), 2008 WL 5352022, at *2 (N.D. Cal. Dec. 19, 2008) (default judgment awarding $50,000 per

8    infringing domain name against serial cybersquatter who registered 663 confusingly similar

9    domain names).  Magistrate Judge Westmore based her thorough analysis in *Banana Ads* on the

10   bad faith criteria identified in the ACPA, 15 U.S.C. § 1125(d)(1)(B)(i), and the Court agrees that

11   those factors—and Magistrate Judge Westmore's analysis—provide a helpful framework for

12   considering damages in this case, with some modification.

13        The Court first notes that Defendant has registered a large number (54) of domain names

14   incorporating Plaintiff's trademark.  As such, the Court agrees with Plaintiff that this evidence of

15   bad faith is sufficient to begin with a minimum assessment of $30,000 in statutory damages per

16   offending domain name.  Pl.'s Supp. 8; 15 U.S.C. § 1125(d)(1)(B)(i)(VIII).  The Court disagrees

17   that Defendant's alleged registration of domain names incorporating the trademarks of other

18   digital download providers justifies doubling this base award, however, because Plaintiff has

19   merely alleged this fact in the Complaint without furnishing evidence to support the assertion that

20   Defendant is a "serial cybersquatter."  *Id.*; *see* Compl. ¶ 20.

21        Plaintiff further argues that the $30,000 minimum should be doubled because of

22   Defendant's use of the Infringing Domain Names to redirect Internet traffic and mislead users.

23   Pl.'s Supp. Br. 8.  Here, the Court cannot completely agree with Plaintiff.  At some point between

24   the filing of the Complaint and the filing of Plaintiff's Motion for Default Judgment, the

25   redirection from many of the Infringing Domain Names changed such that instead of resolving to

26   "bittorrent.net," they now resolve to "bittorrent.eu."  *Compare* Compl. ¶ 22 *to* Oleksiuk Decl. ¶ 8.

27   Plaintiff is not seeking damages or injunctive relief in connection with Defendant's maintenance

28   of "bittorrent.eu."  The Court takes note that "bittorrent.eu," while continuing to display the

BITTORRENT mark prominently at the top of the page, is a passive website that simply reports on the status of this lawsuit.  *See* Oleksiuk Decl. Exh. 5; *compare* 15 U.S.C. § 1125(d)(1)(B)(i)(V) (extent of diversion of customers) *to id.* (IV) (extent of bona fide, noncommercial use).  While this conscious uncoupling of the other Infringing Domain Names from "bittorrent.net" evinces a certain awareness of wrongdoing on Defendant's part, the Court will not ignore that the majority of the Infringing Domain Names now no longer redirect users to a site that offers competing services and capitalizes on consumer confusion.  *Cf. Banana Ads*, 2013 WL 1873289, at *16. Based on the prior activity of the Infringing Domain Names that existed in February 2012, when Plaintiff began investigating this lawsuit, the Court will assess an additional $5,000 for a minimum of $35,000 in statutory damages per offending domain name.

Plaintiff seeks a further enhancement for domain names that incorporate identical spellings of the BITTORRENT trademark.  Pl.'s Supp. 8-9.  Here, unlike in *Banana Ads* and *Verizon*, Defendant registered the exact spelling of Plaintiff's mark with different suffixes.  "The most common method of locating an unknown domain name is simply to type in the company name or logo with the suffix .com. . . . As a result, companies strongly prefer that their domain name be comprised of the company or brand trademark and the suffix .com."  *Sporty's*, 202 F.3d 489, 493 (2d Cir. 2000).  Fourteen of the Infringing Domain Names employ Plaintiff's trademark with a country-specific suffix such as .fr or .de or include the identical spelling of Plaintiff's mark next to the common term "www."[11]  These domain names are particularly likely to deceive users who may attempt to locate an unknown domain name by typing in the name of Plaintiff's company coupled with their country-specific suffix or by typing in the generic prefix "www."  Defendant's registration of domain names that use identical spellings of Plaintiff's mark or includes the mark alongside the common term "www" is therefore especially egregious and shall be assessed an additional $15,000 for a total of $50,000 in statutory damages per domain.

---

[11] These are: "BITTORRENT.ASIA"; "BITTORRENT.AT"; "BITTORRENT.CH"; "BITTORRENT.FR"; "BITTORRENT.INFO"; "BITTORRENT.MOBI"; "BITTORRENT.PL"; "BITTORRENT.TEL"; "BITTORRENT.TV"; "BITTORRENTS.DE"; "WWW-BITTORRENT.COM"; "WWW-BITTORRENT.DE"; "WWWBITTORRENT.COM"; "WWWBITTORRENT.DE."

United States District Court
Northern District of California

Finally, two domain names are particularly egregious and warrant maximum statutory damages: bittorrent.net and bittorrent.de.  In February 2012, all of the Infringing Domain Names redirected users to "bittorrent.net," which offered links to digital download services but deceived users into paying money without ever receiving services.  Compl. ¶ 22, Exh. C; Crittenden Decl. ¶ 6, Exh. 1.  Because "bittorrent.net" was thus Defendant's main website that capitalized on user confusion and competed against Plaintiff for digital downloads, this domain name warrants maximum statutory damages of $100,000.  The Court further takes note that "bittorrent.de" continues to prominently display the BITTORRENT mark and offer digital download services.  Oleksiuk Decl. ¶ 8, Exh. 5.  As such, the "bittorren.de" domain name also warrants the imposition of maximum statutory damages of $100,000.

Based on the foregoing, the Court concludes that Plaintiff should be awarded $2,230,000.00 in damages, constituting $35,000 for each of thirty-eight (38) domain names that incorporate confusingly similar misspellings of Plaintiff's trademark, $50,000 for each of fourteen (14) domain names that incorporates an exact spelling of Plaintiff's trademark, and $100,000 for two (2) domain names that are particularly egregious.

### B.   Injunctive Relief Against Defendant

Plaintiff requests a permanent injunction against Defendant's future infringing uses of Plaintiff's BITTORRENT trademark.  Pl.'s Mot. 22.  Injunctive relief is authorized under 15 U.S.C. § 1116(a) to prevent trademark infringement, unfair competition, and cybersquatting violations as have been claimed in the present case.  "Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by defendant's continuing infringement."  *Century 21*, 846 F.2d at 1180.  However, courts considering permanent injunctive relief under 15 U.S.C. § 1116(a) must still apply traditional equity principles and inquire whether a plaintiff has demonstrated: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see also*

United States District Court
Northern District of California

1   *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013)

2   ("actual irreparable harm must be demonstrated to obtain a permanent injunction in a trademark

3   infringement action").

4         Here, Plaintiff has established irreparable injury in the form of damage to its reputation and

5   goodwill from Defendant's systematic cybersquatting and use of the BITTORRENT mark to

6   deceive customers into paying for illusory digital download products and services.  Compl. ¶¶ 26-

7   27; Pl.'s Mot. 23; Crittenden Decl. ¶ 6.  That the Infringing Domain Names now resolve to

8   "bittorrent.eu," a passive site, does not guarantee that Defendant will not return to its old ways

9   once this case is resolved.  Furthermore, Defendant's use of the Infringing Domain Names to

10  intercept Plaintiff's confidential business correspondence itself constitutes irreparable injury for

11  which there is no adequate remedy at law.  Compl. ¶ 28; Edwards Decl. ¶¶ 5-10.  The balance of

12  hardships and the public interest also weigh in favor of equitable relief.  Defendant is in default

13  and has not demonstrated that it would incur any hardship from being permanently enjoined

14  against infringing Plaintiff's trademark.  That cybersquatting may be Defendant's "business" does

15  not weigh against injunctive relief, because that "business" is unlawful.  Edwards Decl. ¶ 5; 15

16  U.S.C. § 1125(d).  Moreover, the public is not disserved by a permanent injunction, particularly

17  because Plaintiff has demonstrated that the public may have been deceived and even harmed by

18  Defendant's trademark infringement and cybersquatting.  As such, equity favors the entry of a

19  permanent injunction against Defendant.

20        Generally, the scope of a permanent injunction "must be narrowly tailored to remedy only

21  the specific harms shown by the plaintiff[] rather than to enjoin all possible breaches of the law."

22  *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 998–1002 (N.D. Cal. 2006) (citing *Price v. City of*

23  *Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004)).  Furthermore, Federal Rule of Civil Procedure

24  65(d) requires that a permanent injunction "state its terms specifically" and describe "in

25  reasonable detail . . . the act or acts restrained or required."  Fed. R. Civ. P. 65(d).  At the August

26  7, 2014 hearing, the Court ordered Plaintiff to draft and submit a separate proposed injunction that

27  complies with Rule 65 and is narrowly tailored to the parties and conduct asserted in this case.

28  Plaintiff did so on August 28, 2014.  Pl.'s Prop. Inj., ECF 44-1.  Plaintiff requests that Defendant

United States District Court
Northern District of California

1    be enjoined from any future commercial use or infringement of the BITTORRENT mark or any

2    confusingly similar variation thereof, as well as from using the BITTORRENT or confusingly

3    similar variation as a domain name.  *Id.*  The Court is satisfied that such an injunction would be

4    narrowly tailored to Defendant's established infringement of Plaintiff's trademark.

5         Plaintiff's request for a permanent injunction against Defendant's future infringing uses of

6    Plaintiff's trademark is accordingly GRANTED.[12]

7         **C.    Transfer of Offending Domain Names**

8         Plaintiff also requests that Defendant be ordered to transfer to Plaintiff the Infringing

9    Domain Names, as well as any infringing variations that Defendant may register, and that the

10   registrars and registry operators of the Infringing Domain Names be ordered to effect the transfer

11   if Defendant fails to comply.  Pl.'s Mot. 22-23; Pl.'s Prop. Inj.  The ACPA authorizes transfer of

12   offending domain names to the mark owner, 15 U.S.C. § 1125(d)(1)(C), and Plaintiff is entitled to

13   transfer and ownership of the 54 Infringing Domain Names that are identical to or confusingly

14   similar to Plaintiff's trademark.  *See Verizon*, 2008 WL 5352022, at *2-3; *Banana Ads*, 2013 WL

15   1873289, at *20.  The Court will not, however, order Defendant to transfer "all other 'bittorrent'

16   domain names that the Defendant *may* use or register," *see* Pl.'s Prop. Inj. (emphasis added), as

17   the ACPA does not provide for the transfer of future offending domain names, and in any event

18   Defendant will already be enjoined from registering additional trademarked or confusingly similar

19   domain names.

20        Because many of the Infringing Domain Names may be registered outside of the United

21   States, the Court ordered supplemental briefing on its jurisdiction to order foreign registrars and

22   registry operators to transfer offending domain names.  Plaintiff's August 28, 2014 supplemental

23   brief argues that this Court may order foreign registrars to transfer domain names to Plaintiff but

24   also notes that many of the Infringing Domain Names are in fact registered in the United States.

25   Pl.'s Supp. Br. 9.  The Court declines to order registrars or registry operators that are not in the

26

27   [12] The Court's injunction order adopts language from similar injunctions issued by other courts in
     this district, which this Court finds to be more precisely tailored than Plaintiff's proposed
28   language.  *See Banana Ads*, 2013 WL 1873289, at *23-24; *Verizon*, 2008 WL 5352022, at *3;
     *Chanel, Inc. v. Lin*, No. C 09-04996 SI, 2010 WL 2557561 (N.D. Cal. June 21, 2010).

United States District Court
Northern District of California

1    United States to turn over infringing domain names.  However, in conjunction with the Court's

2    entry of an order requiring Defendant to transfer the offending domain names to Plaintiff, the

3    registrars or registry operators that maintain the Infringing Domain Names are hereby authorized

4    to transfer such domain names to Plaintiff, at Plaintiff's request and upon being provided a copy of

5    this order, whether or not Defendant has authorized the transfer.

6          With that proviso, Plaintiff's request for an order that Defendant transfer the Infringing

7    Domain Names to Plaintiff is GRANTED.

8          **D.    Attorney Fees and Costs**

9          Plaintiff seeks costs and reasonable attorney fees pursuant to 15 U.S.C. § 1117(a), which

10   provides that the Court shall award "the costs of the action" where the defendant has violated 15

11   U.S.C. §§ 1125(a) or (d) and "may award reasonable attorney fees" in exceptional cases.  15

12   U.S.C. § 1117(a).  There appears to be some disagreement among the circuits—and among the

13   courts in this district—whether the Lanham Act authorizes an award of attorney fees pursuant to §

14   1117(a) when the prevailing party elects statutory damages under subsection (c) instead of actual

15   damages under subsection (a).  *Compare K & N Engineering, Inc. v. Bulat*, 510 F.3d 1079, 1082

16   (9th Cir. 2007) (no attorney fees under (b) when seeking statutory damages under (c)); *Symantec*

17   *Corp. v. Logical Plus, Inc.*, No. C 06-7963 SI, 2010 WL 2330388, at *3 n.6 (N.D. Cal. June 4,

18   2010) (no attorney fees under either (a) or (b) when electing statutory damages under (c)); *with*

19   *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 111 (2d Cir. 2012) (distinguishing *K&N*

20   and permitting attorney fees under (a) when electing statutory damages under (c)); *Ploom, Inc. v.*

21   *Iploom, LLC*, No. 13-CV-05813 SC, 2014 WL 1942218, at *8 (N.D. Cal. May 12, 2014) (finding

22   *Louis Vuitton* more persuasive on availability of permissive attorney fees under (a)).

23         Here, although Plaintiff is seeking statutory damages, it is doing so under § 1117(d).  That

24   provision, unlike subsection (c), does not reference subsection (a) and therefore does not suggest

25   that remedies under subsections (d) and (a) are entirely mutually exclusive.  *Compare* 15 U.S.C. §

26   1117(c) (plaintiff may elect to recover statutory damages "instead of actual damages and profits

27   *under subsection (a)*" (emphasis added)) *with id.* § 1117(d) (plaintiff may elect to recover

28   statutory damages "instead of actual damages and profits"); *accord Verizon California Inc. v.*

United States District Court
Northern District of California

*Onlinenic, Inc.*, No. C 08-2832 JF (RS), 2009 WL 2706393, at *10 n.4 (N.D. Cal. Aug. 25, 2009).

As such, the Court concludes that attorney fees are available under § 1117(a) when a plaintiff

elects statutory damages under § 1117(d), provided the case is exceptional.

The Court will therefore award Plaintiff the costs of this action pursuant to 15 U.S.C. §

1117(a).  As to attorney fees, "[a] trademark case is exceptional where the district court finds that

the defendant acted maliciously, fraudulently, deliberately, or willfully."  *Watec Co. v. Liu*, 403

F.3d 645, 656 (9th Cir. 2005).  Here, Defendant's infringement of Plaintiff's trademark is clearly

willful, as Defendant began its scheme of registering the BITTORRENT trademark in Europe and

infringing or confusingly similar domain names after Plaintiff rejected Defendant's offered

partnership in 2003.  Compl. ¶¶ 18-19.  The websites that Defendant, for a time, maintained on the

Infringing Domain Names prominently display Plaintiff's trademark to induce customers to pay

for digital download products and services that they never receive.  Crittenden Decl. ¶ 6, Exh. 1.

Moreover, this Court has found that Defendant undertook its scheme of registering confusingly

similar domain names in bad faith, as demonstrated by Defendant's admission to using the

Infringing Domain Names to intercept Plaintiff's confidential business communications and by

Defendant's attempt to extort millions of dollars from Plaintiff by offering to sell Plaintiff its

many domain names.  Edwards Decl. ¶¶ 5-10.  Although bad faith does not necessarily mandate a

declaration of exceptionality, here it simply reinforces the Court's conclusion that the facts

indicate Defendant engaged in a scheme of deliberate, intentional, and willful trademark

infringement aimed at causing customer confusion and forcing Plaintiff to get its name back by

paying Defendant for the Infringing Domain Names.  *See Earthquake Sound Corp. v. Bumper*

*Indus.*, 352 F.3d 1210, 1216-17 (9th Cir. 2003) (collecting cases).

Accordingly, the Court finds that this is an exceptional case within the meaning of 15

U.S.C. § 1117(a) and GRANTS Plaintiff's request for costs and reasonable attorney fees, subject

to proof.

## V.    ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiff's Motion for Default

Judgment is GRANTED and Plaintiff is awarded $2,230,000.00 in damages, along with costs and

reasonable attorney fees, subject to proof.  **Within fourteen (14) days** of the entry of judgment, Plaintiff shall submit a motion for costs and attorney fees with supporting documentation complying with the requirements of Federal Rule of Civil Procedure 54 and Civil Local Rule 54.

IT IS FURTHER ORDERED THAT a separate injunction order shall issue on the following terms:

1.	Defendant Bittorrent Marketing GmbH ("Defendant") and its officers, agents, servants, employees, and attorneys, and all persons acting in concert or participation with Defendant who receives actual notice of this Order by personal service or otherwise, including electronic mail, facsimile, United Parcel Service, or Federal Express, are hereby restrained and ENJOINED from:

a.	Using the BITTORRENT mark, or any mark confusingly similar, in connection with the unauthorized marketing, promotion, advertising, sale, or distribution of any products and services in a manner likely to confuse consumers as to the association, affiliation, endorsement, or sponsorship of BitTorrent, Inc.;

b.	Any acts of infringement of the BITTORRENT trademark; and

c.	Registering, using, trafficking in, or benefitting from Internet domain names that incorporate the BITTORRENT mark or incorporate words, numbers, or symbols that, collectively or in isolation, are confusingly similar to the BITTORRENT mark.

2.	Pursuant to 15 U.S.C. § 1125(d)(1)(C), Defendant is HEREBY ORDERED to transfer to BitTorrent, Inc. the following domain names:

1. BIT-TORENT.COM
2. BIT-TORENT.DE
3. BIT-TORRENT.AT
4. BIT-TORRENT.COM
5. BITORENT.AT
6. BITORENT.CH
7. BITORENT.COM
8. BITORENT.DE
9. BITORENT.NET
10. BITORENT.ORG
11. BITORET.COM
12. BITORREN.COM
13. BITORRENT.AT

United States District Court
Northern District of California

14. BITORRENT.CH
15. BITORRENT.COM
16. BITORRENT.DE
17. BITORRENT.NET
18. BITORRENT.ORG
19. BITORRET.COM
20. BITT-TORRENT.COM
21. BITTOREN.COM
22. BITTORENT.AT
23. BITTORENT.CH
24. BITTORENT.COM
25. BITTORENT.NET
26. BITTORENT.ORG
27. BITTORET.COM
28. BITTORET.DE
29. BITTORNET.DE
30. BITTORREN.DE
31. BITTORREND.COM
32. BITTORRET.COM
33. BITTORRET.DE
34. BITTORRET.NET
35. BITTORRET.ORG
36. BITTORRNET.DE
37. BITTTORRENT.COM
38. BTORRENT.DE
39. BITTORRENT.ASIA
40. BITTORRENT.AT
41. BITTORRENT.CH
42. BITTORRENT.FR
43. BITTORRENT.INFO
44. BITTORRENT.MOBI
45. BITTORRENT.PL
46. BITTORRENT.TEL
47. BITTORRENT.TV
48. BITTORRENTS.DE
49. WWW-BITTORRENT.COM
50. WWW-BITTORRENT.DE
51. WWWBITTORRENT.COM
52. WWWBITTORRENT.DE
53. BITTORRENT.DE
54. BITTORRENT.NET

3.      Registrars of the 54 Infringing Domain Names listed above are authorized to transfer ownership and control of the Infringing Domain Names registered with such registrar to BitTorrent, Inc., at BitTorrent's request upon being provided a copy of this Order, whether or not Defendant has authorized the transfer.

4.      Registry operators of the 54 Infringing Domain Names listed above are authorized to change the registrar of record for the Infringing Domain Name to a registrar of BitTorrent, Inc.'s choosing, at BitTorrent's request upon being provided a copy of this Order, whether or not

Defendant has authorized the change.  Any new registrar of record chosen by BitTorrent shall be authorized to complete the transfer of the Infringing Domain Name to BitTorrent.

     5.     The Court hereby ORDERS that notice of this Order may be served by sending copies of this Order to the offices of Christoph Hoppe, German counsel for Defendant, by email and Federal Express, with an email copy to office@bittorrent.eu.

     6.     The Court retains jurisdiction for the purpose of making any further orders necessary or proper for the consideration or modification of this Order, the enforcement thereof, and the punishment for any violations thereof.

**IT IS SO ORDERED.**

Dated: November 5, 2014

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California